**FILED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

FEB 0 1 2005

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT |
| Plaintiff, | |
| v. | |
| JEFFREY A. BRADLEY and ROBERT L. MARTIN, | 05CV62 Docket No. |
| Defendants. | |

The United States Commodity Futures Trading Commission ("Commission"), by its attorneys, alleges as follows:

**I. Summary**

1. As alleged below, from at least January 2001 through at least October 2002 ("the relevant period"), Defendants Jeffrey A. Bradley and Robert L. Martin (collectively "Defendants") have engaged in acts and practices which constitute violations of the Commodity Exchange Act, as amended, (the "Act") 7 U.S.C. §§ 1 *et seq.* (2002).

2. During the relevant period, Defendant Bradley was a manager of marketing for CMS Field Services, Inc. ("Field Services"), a subsidiary of CMS Energy Corporation, operating out of Tulsa, Oklahoma, and traded natural gas for Field Services. Defendant Martin was a director of gas supply and in that capacity managed contracts under which producers supplied natural gas to Field Services.

3. During the relevant period, Defendant Bradley routinely provided market information concerning natural gas physical trades entered into by Field Services to natural gas reporting firms, including but not limited to *Gas Daily*, *Btu Daily*, *Natural Gas Intelligence* ("*NGI*"), and *Natural Gas Week*.

4. Reporting firms, such as *Gas Daily*, provide price indexes for the natural gas industry and compile price indexes using price and volume information taken from actual fixed price, physical gas trades executed by energy companies. The price indexes are widely used by natural gas market participants to price and settle natural gas transactions and for price discovery and risk assessment.

5. Defendant Bradley routinely bought and sold natural gas at index-based prices. Defendant Martin managed natural gas contracts that settled against such indexes.

6. On numerous occasions during the relevant period, Bradley knowingly submitted false, misleading or knowingly inaccurate transaction information regarding hundreds of natural gas transactions to multiple natural gas reporting firms, including but not limited to *Gas Daily*, *Btu Daily*, *NGI* and *Natural Gas Week*, by reporting fictitious trades as if they were *bona fide* transactions entered into on behalf of Field Services, by altering the prices and volumes for trades actually entered into on behalf of Field Services, or by reporting non-fixed price trades as if they were fixed price trades.

7. By such conduct, Defendant Bradley knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports concerning information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, in violation of Section 9(a)(2) of the Act, 7 U.S.C. §13(a)(2).

8. Defendant Bradley engaged in such conduct with the intent to affect the prices set forth in the indexes and thereby, attempted to manipulate the price of natural gas, in violation of Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2).

9. On at least one occasion during the relevant period, Bradley and Martin coordinated and conspired to provide, and did provide, false, misleading or knowingly inaccurate information to reporting firms concerning purported Field Services natural gas transactions on the pipeline point know as Northern Natural TOK ("NNTOK"). By such conduct, Defendants submitted, or caused to be submitted, false, misleading or knowingly inaccurate market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, in violation of Section 9(a)(2), 7 U.S.C. §13(a)(2).

10. Defendants submitted the false, misleading or knowingly inaccurate trade information in an attempt to manipulate the price of natural gas in order to benefit contracts managed by Martin for Field Services, in violation of Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2).

11. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action against the Defendants to enjoin such acts and practices, and to compel Defendants' compliance with the Act. In addition, the Commission seeks civil monetary penalties and other such ancillary relief, as this Court may deem necessary or just under the circumstances.

## II.   Jurisdiction and Venue

12. This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is

about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder.

13. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Defendants transacted business in this District, and the acts and practices in violation of the Act and the Regulations have occurred, are occurring, or are about to occur within this District.

14. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

### III.   The Parties

15. Plaintiff Commission is the independent federal regulatory agency charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder. 17 C.F.R. §§ 1.1. *et seq.*

16. Defendant Bradley resides in Bixby, Oklahoma. During the relevant period, Bradley was employed as Manager of Marketing for Field Services.

17. Defendant Martin resides in Tulsa, Oklahoma. During the relevant period, Martin was employed by Field Services as Director of Gas Supply.

### IV.   Facts

#### A.   Defendants Traded and/or Managed Natural Gas for Field Services and Reported, or Caused to be Reported, Market Information

18. During the relevant period, Bradley was a manager and trader for Field Services, working out of the Tulsa, Oklahoma facility, and held the title of Manager of Marketing. Martin

4

managed natural gas contracts for Field Services, also located at the Tulsa facility, and was the Director of Gas Supply.

19.     During the relevant period, the business of Field Services was to gather and process natural gas.[1]  Field Services also engaged in wholesale energy trading.

20.     Natural gas was, and is, a commodity that traveled in interstate commerce through a network of pipelines across the United States.

21.     During the relevant period, CMS Field Services sought to buy and sell natural gas for profit.  To that end, its traders/marketing representatives entered into transactions calling for the actual physical delivery of natural gas ("physical trades").  Physical trades typically were priced with either a fixed price set at the time of the transaction or with reference to an index to be published at a later date.

22.     As a trader for Field Services, Bradley traded and marketed natural gas.  In trading and marketing natural gas, Bradley entered into physical trades, some of which were priced according to the indexes.  As Director of Gas Supply, Martin was responsible for purchasing natural gas from well-head producers for use in Field Services' processing plant.  The contracts for such natural gas purchases commonly settled against index-based prices.

23.     During the relevant period, Bradley also submitted, or caused to have submitted, reports concerning natural gas transactions to numerous natural gas reporting firms that compiled natural gas price indexes for the industry, including, *Gas Daily, Btu Daily* and *NGI*.  During the relevant period, on at least one occasion, Martin conspired and coordinated with Bradley, and caused reports to be submitted to natural gas reporting firms, including *Gas Daily, Btu Daily, NGI* and *Natural Gas Week*.

---

[1] On July 2, 2003, CMS announced that it had completed the sale of its CMS Field Services subsidiary to Cantera Natural Gas, Incorporated.

## B.    Natural Gas Market Participants' Use of Indexes

24. During the relevant period, reporting firms, such as *Gas Daily*, *Inside FERC* and *NGI*, calculated the indexes using natural gas transaction information, including volume, price, and delivery point/pricing location ("hub"). The reporting firms obtained and collected the transaction information used to calculate the indexes from reports submitted by market participants, including Defendant Bradley.

25. The reporting firms, including *Gas Daily*, *Btu Daily* and *NGI*, sought from natural gas traders specific market information, *i.e.*, price and volume data, derived from fixed price, physical, natural gas trades the traders actually executed.

26. Natural gas traders submitted price and volume data to reporting firms for use in compiling the indexes.

27. Natural gas traders and marketers, including Defendants, generally knew that the reporting firms compiled their indexes using price and volume data from fixed price, physical natural gas transactions actually executed by the traders.

28. After collecting the reports submitted by market participants of their price and volume information for natural gas transactions entered into at each hub, the reporting firms calculated a volume-weighted average to determine and issue the index prices.

29. During the relevant period, *Gas Daily,* issued by Platts, a division of the McGraw-Hill Companies, provided a daily index that provided natural gas market information and price indexes for natural gas hubs throughout the United States and Canada. *Gas Daily* also provided a monthly index during the relevant period. The *Inside FERC Gas Market Report* ("*Inside FERC*"), likewise issued by Platts, also provided a monthly index for various natural gas delivery points. The *Gas Daily* and *Inside FERC* monthly index surveys were consolidated in July 2002.

30. *Btu Daily*, *NGI* and *Natural Gas Week* also provided natural gas transaction data during the relevant period and were widely used by participants in the energy industry.

31. Monthly indexes are calculated on a month-ahead basis. They are derived from prices and volumes of natural gas transactions scheduled for delivery throughout the coming month. Thus, for example, monthly index prices for August are typically based on price and volume data collected from market participants during the last five business days of July. This period is known as "bidweek."

32. Daily indexes are calculated on a day-ahead basis. They are derived from prices and volumes of natural gas transactions scheduled for delivery on the following day. Thus, for example, the daily index prices for Wednesday are based on price and volume data submitted by market participants on Tuesday.

33. During the relevant period, participants in the natural gas markets used the natural gas indexes to price and settle commodity transactions; that is, the indexes were used to calculate the values of trades that were executed at the index price.

34. Natural gas futures traders referred to the index prices published by the trade publications for price discovery and for assessing price risks.

35. Information concerning prices and volumes of natural gas trades reported by natural gas traders, including Defendant Bradley, to reporting firms, such as *Gas Daily* and *Natural Gas Intelligence*, is and was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

C.   **Field Services' Reporting to Energy Industry Publications**

36. During the relevant period Bradley submitted, on behalf of Field Services, numerous reports of natural gas transaction information, including price and volume data, to

7

several natural gas reporting firms, including *Gas Daily*, *Btu Daily*, *NGI* and *Natural Gas Week*. These submissions were sent via facsimile to various locations, including the Houston-area offices of *Gas Daily* and *NGI*.

37. For instance, on July 31, 2002, Bradley submitted, through an administrative assistant, monthly reports of natural gas transaction information, including price and volume data, for natural gas transactions for delivery in the month of August 2002 to *Gas Daily*, *Btu Daily*, *NGI* and *Natural Gas Week*. On August 30, 2002, Bradley submitted monthly reports of natural gas transaction information, including price and volume data, for natural gas transactions for delivery in the month of September 2002 to *Gas Daily*, *Btu Daily* and *NGI* and *Natural Gas Week*. Bradley also submitted monthly data for at least nine months during 2001. Each monthly submission included multiple transaction reports.

38. During the relevant period, Bradley also submitted, through an administrative assistant, daily reports of natural gas transaction information, including price and volume data, via facsimile to *Gas Daily*, *Btu Daily* and *Natural Gas Week*. For instance, on 119 days during the period of February 25, 2002 through October 14, 2002, Bradley submitted daily reports of natural gas transaction information, including daily price and volume data, for various pipelines each day to *Gas Daily*, *Btu Daily* and, beginning in July 2002, *Natural Gas Week*.

39. On numerous occasions during the relevant period, Bradley knowingly submitted, or caused to be submitted, false, misleading or knowingly inaccurate transaction information regarding hundreds of natural gas transactions. In those reports, he provided false or misleading or knowingly inaccurate prices and/or volumes for certain trades. Specifically, Bradley reported, among other things, fictitious trades as if they were *bona fide* transactions entered into on behalf of Field Services or actual trades entered into by Field Services, but with the prices of those

8

transactions altered and/or the volumes significantly inflated or deflated—such that trades potentially were weighed more heavily in the compilation of the index. Bradley also reported index-based trades as through they were fixed price trades.

40. During the relevant period, Bradley submitted to the reporting firms natural gas transaction information for at least 848 daily transactions and represented that the transaction information represented *bona fide* transactions entered into by Field Services. Of those 848 submitted daily transactions, approximately 261 were not actual transactions entered into by Field Services, *i.e.*, Bradley had reported fictitious trades.

41. In addition, approximately 158 of those 848 submitted daily transactions included altered prices and volumes for trades actually entered into on behalf of Field Services, while approximately 310 of the 848 submitted daily transactions were based on non-fixed price transactions actually entered into by Field Services.

42. Bradley submitted or caused to be submitted these false, misleading or knowingly inaccurate transaction reports on at least 119 days during the relevant period. Each daily submission included multiple transaction reports.

43. On each occasion that Bradley knowingly submitted, or caused to be submitted, reports of natural gas transactions that included false or misleading or knowingly inaccurate prices and/or volumes, Bradley did so in an attempt to manipulate the price of natural gas, which, if successful, could have affected the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

### D. Defendants' Coordinated Attempt to Manipulate Natural Gas Prices

44. On at least one occasion during the relevant period, Bradley and Martin coordinated and conspired to provide, and did provide, false, misleading or knowingly inaccurate

information to reporting firms concerning purported Field Services natural gas transactions on the pipeline point know as NNTOK in an attempt to manipulate the price of natural gas, a commodity in interstate commerce.

45.   On July 30, 2002, Bradley received a telephone call from Tom Haywood, an employee of *Gas Daily* responsible for collecting transaction information from energy industry market participants. In that telephone call, Haywood asked Bradley for Field Services' transaction information for NNTOK.

46.   Bradley then contacted Martin by telephone and they conspired about how Bradley should report to *Gas Daily* in order to benefit natural gas contracts being managed by Martin:

> **Bradley**: Bob? Hey *Inside FERC* guys are asking me, if I have any indication of Northern TOK prices, to list them. You got an agenda?
>
> **Martin**: I don't know. Should we give them anything?
>
> **Bradley**: It's up to you, if you already changed your pricing around where you don't have to mess with it, or—
>
> **Martin**: No, we're still TOK-tied on a zillion contracts.
>
> **Bradley**: Well, let's make up some numbers and turn them in, then.

47.   Bradley and Martin then determined an advantageous index price for NNTOK that was advantageous to the Field Services' contacts Martin managed:

> **Bradley**: You want them low, though.
>
> **Martin**: Oh, yeah.
> . . . .
> **Bradley**: How far behind Demarc would you put [the NNTOK price]?
> . . . .
> **Martin**: Thirteen cents back of Demarc is what I'd say.

48. Thereafter, as agreed upon with Martin, Bradley submitted the fictitious transaction information consistent with the agreed upon desired price for the NNTOK index to, among others, *Gas Daily*.

49. Bradley and Martin fabricated the transaction information alleged above for the specific purpose of manipulating the index price for natural gas at NNTOK.

## V. Violations of the Commodity Exchange Act

### Count I: Delivery of False or Misleading or Knowingly Inaccurate Information

50. The allegations contained in paragraphs 1 through 49 above are re-alleged and incorporated by reference herein.

51. Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person "[k]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ."

52. Defendants violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), when they knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to industry reporting firms that calculated and reported the index price of natural gas.

53. Information concerning prices and volumes of natural gas trades affects or tends to affect the price of natural gas, a commodity in interstate commerce.

54. On at least one occasion, Defendant Martin aided, abetted, counseled, or acted in combination or in concert with Bradley in Bradley's violations of Section 9(a)(2) and is liable for Bradley's violations as a principal, pursuant to Section 13(a) of the Act.

55. Each occasion upon which Defendants knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate information concerning natural gas transactions, including but not limited to those specifically alleged herein, is alleged herein as a separate and distinct violation of section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2).

### Count II: Attempted Manipulation of Natural Gas Price Indexes

56. The allegations contained in paragraphs 1 through 55 above are re-alleged and incorporated by reference herein.

57. Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, "fines and penalties if the Commission has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act." Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person to "[m]anipulate or attempt to manipulate the price of any commodity in interstate commerce . . . ."

58. Defendants violated Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2), when, with the intent to manipulate the price of natural gas, they knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph,

12

telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to the reporting firms that calculated and reported the index price of natural gas.

59.  On at least one occasion, Defendant Martin aided, abetted, counseled, or acted in combination or in concert with Bradley in Bradley's violations of Sections 6(c), 6(d) and 9(a)(2) and is liable for Bradley's violations as a principal, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

60.  Each occasion upon which Defendants knowingly delivered a false or misleading or knowingly inaccurate report in an attempt to manipulate the price of natural gas, including but not limited to those occasions specifically alleged herein, is alleged herein as a separate and distinct violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S. C. §§ 9, 13b and 13(a)(2).

## VI. Relief Requested

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

A. Providing for a permanent injunction restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2);

B. Directing Defendants to pay civil monetary penalties, to be assessed by the Court against the Defendants, in amounts not to exceed the higher of $120,000 or triple the monetary gain to them for each violation of the Act, as described herein; and,

C. Directing Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

D.   Directing Defendants, pursuant to such procedure as the Court may order, to make full restitution of funds received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described and interest thereon from the date of such violations; and,

E.   Providing for such other and further remedial and ancillary relief as this Court may deem necessary and appropriate.

Dated: January 31, 2005

Respectfully submitted,

James A. Garcia
(D.C. Bar No. 458085)
Michael Solinsky
(D.C. Bar No. 433754)
Trial Attorneys
**United States Commodity Futures Trading Commission**
Division of Enforcement
1155 21st Street, N.W.
Washington, DC 20581
202-418-5000 (Phone)
202-418-5523 (Facsimile)

KEVIN C. LEITCH
(Oklahoma Bar No. 5366)
Assistant United States Attorney
Northern District of Oklahoma
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
918-382-2710 (Phone)
918-560-7939 (Facsimile)

Of Counsel